## Case No. 6,029.

### HANNAH et al. v. The CARRINGTON.

[2 West. Law Month. (1860) 456.]

District Court, N. D. New York.

MARITIME LIEN—PERFORMANCE OF CHARTER-PARTY.

1. Under the general maritime law, the vessel is ordinarily bound to the cargo, and the cargo to the vessel, for the performance of the usual stipulations of the contract of affreightment; but that law gives no lien on a vessel

as a security for the performance of a charter party, or a contract for the transportation of a cargo, until some lawful contract of affreightment is made, and property shipped in pursuance thereof.

[Cited in The Pauline, Case No. 10,848; The R. G. Winslow, Id. 11,736; Scott v. The Ira Chaffee, 2 Fed. 407.]

2. The cases of The Aberfoyle [Case No. 17] and The Pacific [Id. 10,643] commented upon and considered as overruled by the case of Vandewater v. Mills, 19 How. [60 U. S.] 82.

The libel in this case was filed [by Perry Hannah and others against the schooner Carrington, her tackle, apparel, and furniture, and against John Lane, claimant] for the recovery of damages alleged to have been sustained by the violation of a charter-party, or memorandum of charter, made between the libellants and certain part-owners and agents of the Carrington. By the terms of the charter, the vessel was to carry the libellants' freight, of the kind designated, at specified rates, during the season of navigation. It is alleged by the libel, that the part-owners and agents of the Carrington—finding that she could earn more freight and make greater profits by sending her to Buffalo—about the first day of October, and during the period for which she was so chartered, without the libellants' leave, and in direct violation of the charter-party, withdrew her from the trade for which she had been so chartered, and refused any longer to employ her under such charter. It also alleges that freights were then high, and that the libellants were compelled, in consequence of such refusal, to employ other vessels, at higher rates of freight: and that they were, besides, prevented from bringing to Chicago a large quantity of lumber which they then had at Grand-Traverse-Bay; by which they had sustained damages to the amount of $1,800. The claimant, by his answer, insisted, among other things, that the libellants had no lien upon the vessel, even upon the case made by the libel; and by arrangement between the parties, this question was argued without the production of evidence upon the issues of fact made by the answer.

HALL, District Judge. It can hardly be necessary to say, that this suit, being a proceeding in rem, can not be maintained, unless the libellants have a maritime lien, or some other lien or privilege against, or upon, the vessel. As general creditors, however meritorious, they can not proceed against the Carrington in this form of action; and as they have not alleged in their libel, or suggested upon the argument, that they have any lien other than the lien or privilege given by the general maritime law, it is only necessary to consider whether, under that law, they have any privilege against the vessel. Upon this point, the libellants' counsel relied upon the following cases: The Volunteer [Case No. 16,991]; Drinkwater v. The Spartan [Id. 4,085]; The Rebecca [Id. 11,619]; Clark v. Crabtree [Id.

2,847]; Airey v. Merrill [Id. 115]; The Tribune [Id. 14,171]; and he insisted that the case last cited was directly in point in this case. The cases thus cited, with the exception of that of The Tribune, are of little importance as bearing upon this question of lien or privilege; but the counsel is right in supposing that the case of The Tribune is an authority in favor of the existence of the lien insisted upon in this case. Nor is he far wide of the mark in his claim that it is a case in point. There is, however, this difference in the two cases. In the case of The Tribune [supra]; a cargo had actually been laden on board. It was afterwards ordered on shore, and the voyage broken up by the ship-owner; and, consequently the liability of the ship-owners accrued after they had had possession of a cargo, against which, upon the performance of the particular voyage for which the vessel was chartered, and such goods were laden on board, they might have proceeded to enforce their maritime lien for freight; unless, indeed, such lien was waived by the terms of the charter.

I do not, however, regard this fact, as one of much significance, and in the absence of any conflict of authority, I should not deem it material to notice the more important fact, that this question of lien does not appear to have been discussed by Judge Story; or to have been argued by the counsel in that case. The omission, of able counsel, to raise the question of lien, and a decree declaring the existence of a lien directed by a judge deservedly distinguished for his extraordinary learning and his singularly full and exact knowledge of admiralty law, might, under ordinary circumstances, be properly held sufficient to justify a judge of this court in maintaining the existence of a lien in a similar case, without farther authority, and without hesitation. But as there are later authorities, apparently in conflict with the case of The Tribune, it is certainly worthy of remark that the learned judge who decided that case, did not discuss the question upon which the present case must turn.

The case of The Tribune [supra] is only one of several authorities, each apparently sufficient to sustain the position of the advocate for the libellants. Lord Tenterden says (Abb. Shipp. marg. p. 126): "A charter-party, made by the master in his own name, furnishes no direct action against the owners, grounded upon the instrument itself, by the law of England; but when this contract is made by the master in a foreign port, in the usual course of the ship's employment, and under circumstances which do not afford evidence of frauds, or when it is made by him at the ship's home, under circumstances which afford evidence of the assent of the owners, the ship and freight, and therefore, indirectly, the owners also, to the amount of the value of the ship and freight, are, by the marine law, bound to the performance. 'The ship is bound to the merchandise, and the merchandise to the ship,' are the words of Cleriac. By the French ordinance, it is declared that the ship, with its furniture and freight, and the cargo, are respectively bound to the stipulations of the charter-party. And Valin, in his commentary says the rule is the same, whether the affreightment be made by the owner, or the master alone; even at the place of the owner's abode, if the owner does not disavow it." The doctrines thus laid down by Lord Tenterden are substantially adopted by Judge Conkling, in his excellent treatise upon the Jurisdiction, Law and Practice of the Admiralty Courts of the United States (pages 123–128, inclusive), and I infer that these principles, in substance, were acted upon, without doubt or hesitation, by Mr. Justice Nelson, in the case of The Aberfoyle [Case No. 17], and, two years later, in the case of The Pacific [Id. 10,643]. The case of The Pacific was very elaborately and ably argued; but the question of jurisdiction, rather than the question of lien, was the principal subject of discussion, both in the arguments of counsel and in the opinion of the court.— In the points and arguments of Messrs. B. F. Butler and Daniel Lord, for the respondents, it was substantially conceded, that the vessel became bound to the performance of the contract upon which the libel, in that case, was filed. The reporter gives the concession in the following language (page 581): (4) "It may be admitted that the vessel became bound to the performance of the contract, and of all the terms of the contract, from the day of the making thereof; and that the particulars in which the libel alleges the breach thereof, were essential terms of such contract. But the question still recurs—Did such breach, occurring before the sailing of the ship, she being actually about to sail, give jurisdiction to a court of admiralty?" It was under this concession as to the liability of the ship, (if the case was one of admiralty jurisdiction) that the learned justice who decided the case upon appeal, entered upon the examination of that case and reached his final conclusion therein. It is therefore not probable that he examined with care, or deliberately considered, the question of lien or privilege; either as it might have been presented in that case, or as it is presented in the case now under consideration. If it was at all considered, it was probably likened to the case of the actual lading of goods under a charter-party, or bill of lading, and not to a case where the ship-owners had refused, as in the present case, to receive merchandise or other cargo which they were bound by the terms of a valid charter party to receive and transport. Nevertheless, the decision of Mr. Justice Nelson, in the case of The Pacific, would have determined me to decide the question now under discussion in favor of the libellant, had not the case of The Yankee Blade (Vandewater v. Mills), 19 How. [60 U. S.] 82, decided at the last term

of the supreme court, been cited by the advocate for the respondent.

. It was contended on the part of the libellant in the case of The Yankee Blade, that the instrument upon which his libel was filed, was in the nature of a charter-party, or had some features of a charter-party; and that the court should, therefore, extend the maritime lien by analogy or inference, for the purpose of giving the libellant his remedy against the ship, and sustaining their jurisdiction. And in his argument, the learned counsel for the libellant endeavored to establish the following proposition: "Agreements for carrying passengers are maritime contracts, pertaining exclusively to the business of commerce and navigation, and consequently, may be enforced, specifically, against the vessel by courts of admiralty, proceeding in rem." This proposition appears to have been deliberately considered, and forms the principal subject of discussion in the opinion of the court, as delivered by Mr. Justice Grier. The learned justice cites and relies upon 2 Boulay Paty (Cours de Droit Commercial), 299, which would seem to be a very direct authority against the existence of a lien in this case. The extract is as follows: "Hors ces deux cas, (viz: default in the delivery of goods, or damage for deterioration,) il n'y a pas de privilege a pretendre de la part du marchand chargeur; car si les dommages et interets n'ont lieu que pour refus de depart du navire, pour depart tardif ou precipite, pour saisie du navire ou autrement, il est evident qu' a cet egard la creance est simple et ordinaire sans aucune sorte de privilege." The case of The Yankee Blade [supra] would necessarily have decided this case without further question, if the decision of that case had depended upon the views entertained by the court upon the question thus discussed by Mr. Justice Grier in his opinion; but it was contended by the advocate for the libellants in this case—and it is apparent upon the face of the opinion—that the decision of that question was not, in the judgment of the court, strictly necessary for the determination of the cause. Mr. Justice Grier says, the contract proceeded upon is not a charter-party; that it is nothing more than an agreement for a special and limited partnership in the business of transporting freight and passengers between New-York and San Francisco; and that it is not one of those contracts to which the peculiar principles or remedies given by the maritime law have any special application, but it is the fit subject for the jurisdiction of the common law courts. But it appears the question before referred to was, nevertheless, fully argued by counsel, and fully considered by the judge; the court having, in that case, followed the practice most frequently adopted in that tribunal, to discuss and determine the important questions raised and argued by the respective counsel, whether their determination is or is not absolutely essential to the judgment to be pronounced—a practice which has many advantages, and has been generally useful, but which has, at times, been the subject of unfavorable remark.

The fact that the case of The Yankee Blade may have been decided upon the ground last suggested by Mr. Justice Grier, in his opinion, and the fact that the case of The Tribune [Case No. 14,171], The Aberfoyle [Id. 17], and The Pacific [Id. 10,643], were not referred to by Mr. Justice Grier, have induced me to examine, with some care, the earlier authorities cited by Lord Tenterden, and some other authorities bearing upon the question, before deciding this case. It will be recollected that Lord Tenterden, in his text, cites the saying of Cleriac, and also refers to the French ordinance (the celebrated Marine Ordinance of Louis XIV.), and the Commentary of Valin. This saying of Cleriac—"Le bateau est oblige a la marchandise, et la marchandise au bateau"—is found in his commentary upon the 21st Article of the Judgments of Oleron (see Les Us et Coutumes de la Amsterdam, Ed. of 1788, at page 43), and substantially the same language is found in the 18th article of "Reglemens de la Navigation des Rivieres" (Id. p. 297). In the first position, it is not, so far as I can see, connected with any other language applicable to the present case; but in the last it would seem to be limited, to some extent, at least, by the contract. The whole article is as follows: "Le bateau est oblige a la marchandise, et la marchandise du bateau; c'est-a-dire, si le marchand ne paie pas le fret, s'il manque au terme et cause du retardement, le patron ou les mariniers sont privilegies de faire saisir les marchandises ou denrees qu'ils ont conduites, et les faire vendre a' concurrence de leur du; comme aussi si le patron ou compagnons n'ont pas fait leur devoir, et qu'a leur faute les marchandises soient empirees, ou deprecies; le marchand prut faire proceder par saisie du bateau, et des apparaux pour son indemnite, le tout par egal privilege." The privilege of a charterer under this article, and the binding of the ship to the performance of the charter-party, would seem to be limited to the cases specified, and to be confined to cases in which the shipper had sustained damages by the fault of the master and crew, in respect to goods actually laden on board. This is, I think, fairly to be inferred, though I concede that it is not so distinctly and directly expressed, as not to admit of doubt. It may be remarked, in passing, that the reference in Abbott is probably to the saying of Cleriac, as first above referred to; and that the attention of the learned author may have rested only upon the epigrammatic saying, which forms his quotation, without having been at all drawn to the same expression and to the context of that saying in the instance last above quoted.

The article of the French ordinance to which Lord Tenterden refers (Liv. 3, tit. 1, art. 11) is in its literal terms an apparent authority for the doctrine which he affirms, and for the position of the advocate for the libellant in this case. It is as follows, article 11: "Le navire, ses agres et apparaux, le fret et les marchandises chargees, seront respectivement affectes aux conventions de la charte-partie." That is to say "the ship, her rigging and tackle, the freight and goods laden shall be respectively bound by the conventions and stipulations of the charter-party." But the learned commentary of Valin upon this article (1 Valin, Rochelle Ed. 1776, p. 629), after referring to the oft-quoted saying of Cleriac before alluded to, and remarking upon the privileges which exist in certain cases, refers the reader, in reference to the damages sustained by the non performance of a charter-party (dommages et interests pretendus par l'affreteur, pour l'inexicution de la charte-partie), to the 16th article, tit. 14, of the first book of his Commentaries (page 362, vol. 1). In commenting upon this article, and particularly that portion of it that relates to the privilege of the merchant-shippers (marchands-chargeurs), he says (page 364): "Cour ce qui est de ces marchands chargeurs, mis au rang des creanciers privilegies, on ne concoit que deux cas ou ils puissent se presenter. L'un est, si les marchandises chargees pour leur compte dans le navire, ne leur ont pas ete remises, l'armateur du navire, ou le capitaine les ayant retenues en tout ou partie; l'autre, si les marchandises leur ayant ete delivrees, elles se sont trouvees avariees par le faut du maitre ou des gens de l'equipage, dont le proprietaire du navire est responsable. Mais l'un et l'autre cas sont egalement difficiles a rencontrer, surtout le premier, un marchand chargeur etant, comme il est naturel, extremement attentif a demander la deliverance de sa marchandise, et a la suivre partout, si le proprietaire et le capitaine refusent ou different de lui en faire la remise. Toujours est-il vrai que, hors ces deux cas, il n'y a pas de privilege a pretendre de la part des marchands chargeurs; car s' il ne s' agit que des dommages et interets pretendus par un affreteur, qui a l'occasson de la saisie reelle du navire ou autrement, aura ete oblige de retirer du navire les marchandises qu'il y avoit chargees, ou qui aura ete empeche d'y faire son chargement; il est evident qu'a cet egard, sa creance est simple et ordinaire sans aucune sorte de privilege; du moins c'est ainsi que je crois qu'on doit limiter la disposition de l'article ii., du titre des charte-parties." This quotation certainly shows that Valin supposed the privilege against the ship for the non-performance of a charter-party, was confined to the two cases mentioned: Of the non-delivery of goods laden on board, and of damage to such goods, by the act of master or crew.

And substantially to the same effect, is the significant quotation from Boulay Paty, made by Justice Grier. That the privilege of the merchant charterer against the vessel chartered, was thus limited under the Marine Ordinance of Louis XIV., and in the judgment of Cleriac and Valin, and has not been extended farther by the general maritime law of Europe, may, I think, be safely assumed upon the language of the Code de Commerce, as adopted in September, 1807, and as published in Paris in 1856. This Code (article 191), enumerates the privileged debts for which ships and other vessels are liable, and extends the privilege to some debts which would not, in this country, be deemed privileged. These debts are divided into eleven classes, and they are privileged in the order in which they are classed. The 11th class embraces, and is in fact confined to "the indemnity due to the freighters, for not delivering the goods laden on board, or for any damage which the goods may have sustained through the default of the captain or crew." This clause of the article, standing now as it did in 1807, in this language: "(11) Les dommages interets dus aux affreteurs pour le defaut de deliverance des marchandises qu' ils sont chargees, ou pour remboursement des avaries souffertes par lesdites marchandises par la faute du capitaine ou de l'equipage." This clearly does not include such a demand as that prosecuted by the libellant in this suit, and this fact is conclusive evidence that in France it has not, for the last half-century, been understood that such a demand is secured by a privilege against the ship. The Civil Code of Louisiana contains substantially the same provision as the Code de Commerce, in respect to the privilege of a charterer or freighter; and by that Code the privilege is thus defined and limited: "The amount of damage done to freighters for the failure in delivering goods which they have shipped, or for the reimbursement of damages sustained by the goods through the fault of the captain or crew."

I am not aware that any such privilege as is claimed by the libellant in this case, can be sustained by any reference to the civil law, or maintained upon any of the principles on which the priviligium, of the Roman law, is based; and I think it quite clear that Lord Tenterden is not sustained by the authority of Cleriac and Valin, on which he relied. This weakens the authorities which have been based upon Lord Tenterden's opinion, and I shall act upon the conviction that, if the question presented in this case shall hereafter be presented to the supreme court of the United States, the learned justices of that court would abide, and ought to abide, by the opinion expressed by Mr. Justice Grier in the case of The Yankee Blade, in favor of the respondents. The libel is therefore dismissed with costs, but without prejudice to any proceeding at

law or in personam in admiralty, which may hereafter be instituted to enforce the payment of damages claimed in this suit. See The Freeman v. Buckingham, 18 How. [59 U. S.] 182–188, at which last mentioned page Mr. Justice Curtis, in delivering the opinion of the court, says: "Under the maritime law of the United States, the vessel is bound to the cargo and the cargo to the vessel, for the performance of a contract of affreightment; but the law creates no lien on a vessel as a security for the performance of a contract to transport cargo, until some lawful contract of affreightment is made, and a cargo shipped under it."